Yes, thank you, Your Honor. May it please the Court. Your Honors, this case presents a fundamental question of whether it resembles AstraZeneca, as the District Court found, which is a case where the plaintiffs challenged the defendants' expressions of confidence that their drug would ultimately be approved, but then ultimately the FDA disagreed. That's a situation that doesn't give rise to an inference of Cyanar. Or is it a case like Pharmacia and Schuenemann, where the plaintiffs challenged not expressions of confidence, but rather the defendants' representations of what the actual data was that formed the safety profile? This case is clearly in that latter group, and that does give rise to a strong inference of Cyanar. And I would direct the Court's attention to paragraph 74 of the complaint, which deals with Defendant Hahn's statements. Defendant Hahn was asked about the drug Ketek, which was a predecessor of a similar type of drug that had some serious liver consequences after it had reached the market, and he said that among the consequences of that was liver toxicity. And then comparing Slythromycin, Cempra's drug, to Ketek, he said that in all of our trials, we've exposed over 2,000 people to Slythromycin. No one has suffered those types of problems, i.e. no one had suffered liver toxicity. Even if you take the most conservative view of the record here and eliminate the 12 other cases that Dr. Avigan found constituted liver toxicity, there is one case of significant drug-induced liver injury that cannot be disputed. Even one of the defendants, Dr. Oldak, testified twice before the FDA that that particular patient who received Slythromycin actually suffered from drug-induced liver injury. Well, now you use the phrase drug-induced liver injury. Is that the same as liver toxicity here for purposes of this case? Yes, Your Honor. Drug-induced liver injury is injury that is caused by the particular drug that was actually administered. I understood. I mean, why isn't a reasonable reading of this record that the defendants in this case understood that term to mean a finding with respect to High's Law and not necessarily elevated levels of liver injury? High's Law is a very extreme form of liver injury. The FDA actually defines it as liver injury so great that recovery may not be possible in some patients. When you use the generic term liver toxicity, which is going to encompass a lot of types of injury, you can't turn around and say, well, that is actually a very specific type of liver injury that we're talking about. Do you have any other incidents of it? Of course, every case is important, but was there one out of 1,474 patients or whatever? There was just one situation. Of this particular type of injury, Dr. Avigan's... Do you have any other cases? Was it just the one? Of that specific type of injury, no, there was only the one. There was only the one. That's correct. It seemed to me that there may have been some... PSLRA, I never get these acronyms completely straight, requires a strong inference of C-enter. I think the district court felt this might have been a case of sloppiness or confusion or something between the CABP and the COPD processes. Would that have been... I'm not sure I understand exactly what each of those processes involved, but it seemed to me that there may have been some confusion about the different trials and that he was speaking purely about CABP. Your Honor, Defendant Hahn was not speaking specifically about CABP because he said that we had exposed over 2,000 patients to slithromycin. That is far over the number of patients that were exposed in terms of the CABP tests themselves. I think it was 1,400, and we provided a chart that demonstrated that in the reply brief. So there's no possibility that when Hahn spoke, he was speaking only about those particular tests. He was encompassing the entire population that had been exposed to slithromycin. How do we know? We know because of the number that he used, Your Honor. Number one, he used the word all. He said in all of our trials, and then he used the number 2,000, which demonstrates that he couldn't be referring only to the CABP tests. And at page 7 of the reply brief, we've got the chart there that shows the number of patients administered slithromycin in the CABP exams. What is the difference between the two trials? Well, they're treating different conditions. CABP is community-acquired bacterial pneumonia, and the COPD is a more serious condition, chronic obstructive pulmonary disease, I believe. And they have different treatment regimens, too. The CABP is a shorter treatment scheme, and then the COPD was longer. And that really gets down to the defendant's argument. They think that the bad liver result and the COPD shouldn't have changed the FDA's mind. But the thing is that their view that that shouldn't have changed their mind doesn't allow them to misrepresent what the actual data is, and that's what they did in this case. They didn't misrepresent anything to the FDA, did they? Well, we're talking about what they said to investors. I understand. I understand that. But, you know, the FDA disapproved. I'm also just thinking about how the overall operation of this is, and I want to know whether there were any misrepresentations alleged with respect to the FDA. Did you have access to the representations that were made to the FDA? Yes, it's in the record, Your Honor. All of the human exposures are obligated to be reported to the FDA, and they were in this case. And those were accurate? Yes, Your Honor. There was a disagreement as to the significance of them, but they were all disclosed. Would accurate disclosures to the FDA bear on Sienta as respect to investors? No, Your Honor, because the investors in this situation, they didn't have access to the information that the FDA got. When Defendant Hahn spoke and said that in none of our trials has there been any sort of liver toxicity, the investors had no way of knowing what would later be submitted to the FDA. And I would call the Court's attention to the Schoenemann case from the Ninth Circuit, which is very similar to the facts here. In Schoenemann, they were trying to get approval of a particular drug, and they had done some animal testing, and one of their tests, a rat test, the rats had developed cancer. And the defendant company and the executives in that case believed that that could be explained by some other theory, and so they said to the public that all of our animal tests were favorable. But the Ninth Circuit, when they got a hold of that case, realized that you're not allowed, and this is their holding, in fact, you're not allowed to misrepresent what the data is because you have a theory as to why the FDA should disregard it. And you think of the consequences if this Court were to rule that just because you believe that a particular piece of evidence shouldn't make a difference that you can misrepresent it. I mean, the implications of that. I mean, I guess the question, CENTER requires something more than negligence or confusion, and there has to be a strong inference of it. And so you have both federal rule, Civil Procedure 9 on fraud generally, and then you have the PSLRA, which says you have to have a strong inference. And the question that I have in my own mind is whether this is a strong inference of CENTER or whether it's an example of confusion or even possibly negligence. You know, I think the district court looked at the record and said, you know, that this wasn't a perfect explanation, but I can't find a strong inference of CENTER here. That's the judgment we have to make, whether it's just a confused situation or whether there was some sort of deliberate attempt. And isn't the issue also the context of everything? There's no question that I think Mr. Han's statement, I mean, isn't correct. But in order to determine whether they've met their burden of CENTER, or you've met your burden of making a showing of CENTER, don't we have to look at the context of the rest of the statements that were made to the investors? You do, Your Honor. To determine whether the inference of CENTER is at least as strong as the opposing inference that could be drawn. You're absolutely right, Your Honor, and I urge the court to look at the context. And so if you'd focus on that for us, I think that's really where the meat of the issue is. Very well, thank you, Your Honor. Okay, number one, this is more than a core business. This is basically SEMPRA's hope to actually make money. They had anticipated revenues from this particular drug of $2 billion. They had lost 200 million, had 200 million losses prior to that. That was a key fact in the Asperian case from the Sixth Circuit, where they said, you know, this is basically the company's only hope of turning a profit. That's number one. Number two, the comparison to Keytech was a very significant factor for this company from the very beginning. If you look at, I think, paragraph 77, Defendant Fernandez said that we knew we needed to deal with Keytech from day one. So, of course, they're going to be familiar with what their own research showed. Number three, each of the defendants actually, in detail, addressed these results. So they had to be familiar with them because they were representing to people that they knew them. For instance, Defendant Holland says, okay, we exposed 2,000 people to this. That certainly implies that he actually knew what he was talking about, and that's basically what the Sixth Circuit held in Asperian, as well as Goldman, Avaya, and Reese, three other cases from other circuits. And if, on the other hand, if Hans spoke about the 2,000 people that had been exposed but didn't know what he was talking about, that would be reckless, too, and that's a specific holding, again, of the Sixth Circuit's decision in Asperian. Also, all of these defendants knew that every human exposure, whether it's COPD or a CABP or the NASH exam, every exposure is turned over to the FDA. So, therefore, they had to be on top of all of the evidence because they knew they would all end up with the FDA at one point. And finally, there are regulations that require that the company be notified almost immediately if there is some sort of severe result, as was the case with the COPD patient who suffered from hepatitis and jaundice, which is, as I think we've established so far, is plainly liver toxicity. I want to follow up on the question of context and Judge Keenan's point, and this relates to the earlier question I asked you about liver toxicity and exactly what the parties understood that to mean. It seemed to me that that encompassed a range of diagnoses, I guess, and so the question I had is whether or not Han, in speaking about liver toxicity, understood it to mean that range or to mean the most extreme level of toxicity, in which case it probably would not be inaccurate. Your Honor, nothing in his comments said that he was adopting the most narrow definition of liver toxicity. Hernandez did say as much. In Paragraph 7 of your own complaint, you quoted a statement from him back in January of 2016 where he says, so ALT increases plus bilirubin equals what is called High's Law, and that means liver toxicity. Perhaps that means that's one example of liver toxicity and not the exclusive one, but I guess my point is there seems to be some confusion about exactly what that means, and so how can we hold these plaintiffs accountable in light of that ambiguity? Your Honor, I don't think there's any ambiguity because when you use the more inclusive term, then that's going to encompass more by definition. And how do we know that he meant that more inclusive term when he said that? Well, Your Honor, I think we're entitled to our inferences in our favor as well. Well, but the inferences sort of are a little bit different in this context where you have to make a compelling showing of cyanide. Right, Your Honor, and I think that if you use the term liver toxicity without any sort of qualification so that investors would be advised that you were in fact using your own secretly, using your own idiosyncratic definition that excluded certain things such as a case as serious as this where there is jaundice and hepatitis, that I think that that's an unreasonable reading of the record, and basically a tie goes to us. So I think under those circumstances, the term liver toxicity has to embrace something that even Dr. Oldak described as drug-induced liver injury at JA876 and saying that we're in complete agreement that this episode of liver injury was attributable to the study drug JA875. That's one of the defendants saying that. And to say that Hahn defined liver toxicity to exclude liver injury I think is not a reasonable inference. I see I've got seven seconds for rebuttal unless the Court has further questions. Thank you. Thank you, Your Honor.  May it please the Court. As this Court observed in the Yates case, which we cite in our papers, when analyzing claims brought under the PSLRA, while plaintiff's allegations should be viewed holistically, those allegations are only afforded, quote, the inferential weight warranted by context and common sense. And I'm going to spend some time talking about common sense and context because respectfully the plaintiffs are asking you to ignore both. Let's not forget the context that the advisory committee actually voted to approve this drug. Let's not forget the context that the FDA said, well, we're not going to approve it right now, but we want you to get additional safety information and insert this drug in 9,000 additional people. Let's not forget Dr. Avigan said the same thing. We want you to insert this drug into 12,000 additional people. In light of that context, I want to go straight to Mr. Hahn's statement because that seems to be where my friend is focused. Mr. Hahn, during an analyst conference call, in response to a question that said, talk to me about Ketek's sordid past, he said, Mr. Hahn said, well, Ketek involved visual disturbance, exacerbation of improper muscle regulation, and what my friend focused on, liver toxicity. And then Mr. Hahn further said, in all of our trials, nobody had any of those same types of issues that the folks had experienced with Ketek. And what happened in Ketek? The plaintiffs themselves pleaded. Paragraph 37 of their complaint. They say that Ketek was linked to, quote, dozens of cases of visual disturbances, loss of consciousness, and here's the important part, severe liver injury which resulted in liver failure, death, and liver transplant. Not any case in any trial, CABP, COPD, and I'm not making light of the hepatitis case, I'm not. I'm not saying it's not serious, it is. But the fact of the matter is, it's not liver death, I'm sorry, it's not liver failure, it's not liver transplant, and it's not death due to liver toxicity. It's not the same thing. We can't divorce Mr. Hahn's statement from that context, particularly in response to an impromptu question on an analyst conference call. Even if we give the plaintiffs the benefit of the doubt and say, okay, maybe he didn't speak completely accurately, that does not equate to he meant to defraud SEMPRA's investors. I respectfully submit you just cannot. It makes no sense to infer a strong inference to defraud based on a comment in a conference call. What concerns me here is the statute, the PSLRA, which requires a strong inference of SEMPRA. And without that statute, I might be inclined to go in the other direction. But the statute is what is important. And I try to think with this PSLRA what Congress was trying to get at. And I think what they were trying to get at is they didn't want every, you know, investments carry a certain amount of risk, and oftentimes stocks go south. And you don't want every time somebody loses money on an investment to have a securities fraud case because that really hikes the cost of raising capital significantly. And I suppose that's particularly true in these instances where we're talking about developmental drugs. It's a very long, drawn-out, and expensive process to begin with. And when you add to that the cost of securities litigation, it can be an extra impediment to medical and pharmaceutical innovation. And you can see the point here because even our more advanced classes of antibiotics are losing efficacy, and they're in a fight against bacteria, and the bacteria are winning. And so the development of a drug which would treat CAPB, which affects huge numbers of people, some fatally, would be a very good thing. And that doesn't excuse fraudulent representations, but I wonder in a borderline case whether the statutory language of a strong inference of SIENTA, whether that doesn't disout it or tilt it one way or the other. That's what I regard this as. I regard this as a close sort of borderline case. I mean, I can see plaintiff's side of it. I can also see the idea that given the medical terms and the context in which the questions were asked, I can see the real possibility of confusion as to what was actually being talked about. And the question I have is whether the statute should be a tiebreaker in a case that could, without the statute, go either way. So I appreciate that, Judge Wilkinson, and I'm not sure if the tiebreaker is the way that I think about it. But you don't think it's a tie? Of course I don't, but you wouldn't expect me to stand up here and say it is a tie. I suppose assuming arguendo that I think it's a tie or that I think it's, you know, a close case. And I'm just wondering whether this statute and what Congress was trying to achieve with it wasn't meant for cases that were close. I think, Your Honor, the context here and the type of case it is, and as the court in Casarelli said, which was a similar kind of case, where if we were to impose liability for every bullish statement that a pharmaceutical company said, we would choke off the lifeblood of medicine and innovation, exactly what the PSLRA and Congress didn't mean to intend or didn't intend to do. And as to the strong inference of Sienter, Your Honor, I would suggest that there's just nothing here as in other cases that would suggest it. And what I mean by that is, as Casarelli said, that there are no particularized allegations of admissions of wrongdoing. A lot of cases have that. There are no particularized descriptions of contemporaneous documents, more importantly. And this distinguishes it from the Zack case that this court issued and also the Asperian case that my friend talked about and the Shulman case that my friend talked about. No contemporaneous conversations with FDA. That FDA was telling the company one thing and the company was telling investors something different. That would get there, maybe. If, for example, the situation here was the FDA told the company in real time, we're very concerned about these ALT elevations. We're very concerned about a signal of liver toxicity. And then the company went around and told investors, no problem. We don't think we have liver toxicity. We only have ALT elevations. That might be Zack. That might be Shulman, and it might be Asperian, but that's not what we have here. We don't have any allegations about contemporaneous conversations with the FDA, nor do we have any allegations from so-called confidential witnesses. We have nothing about that. Judge Keenan, you asked my brother to talk about context, and what he said was, well, it's an important drug to the company. And he cited it to a Sixth Circuit case. That's great, but that ignores Casarelli, who dealt with that exact same scenario and said that a motivation that is common to every single executive in corporate America doesn't lead anywhere near Cyanter. And he also said, well, they were familiar with the clinical trial data, for sure. I'm not going to back away from that. They were definitely familiar with the clinical trial data. But what did that clinical trial data show? It showed that silythromycin-treated patients had AOT elevations. The company disclosed that repeatedly. Furthermore, the company disclosed that the AOT elevations that were shown in silythromycin-treated patients were greater and occurred more often than in the control group. That was fully disclosed. My friend talked about series adverse events. I'm talking about these additional statements, and I've read about the NASH dosage changes and this and that. But it seemed to me that it really came down to that the plaintiffs were placing their real weight and the gravamen of the case on the one patient in the trial, in the CABB trial, singly or combined. It seemed to me that the rubber hit the road on that. The others, I thought, were less important. I didn't think that they were. But this one, I thought, was where they had sort of laid their marker. I agree that that's how the case has since evolved from the filing of the complaint and certainly on appeal. So let's talk about that COPD patient. And let's remember that the company wasn't seeking approval for COPD. They were seeking approval for CABP, which was a completely different dosing regimen, a very short-term five- to seven-day dosing at 400 milligrams. COPD, which only had four patients enrolled in it, a Phase II trial, where the company was studying optimal doses for long-term dosing. COPD was dosed at 400 milligrams a day for 28 days. The one patient that they focused on, the COPD patient who contracted drug-induced hepatitis, started experiencing those symptoms after 23 straight days of dosing at 400 milligrams a day. And I'm not suggesting it's not important or it's not serious. It is, but let's keep it in context, what the company was trying to get approval for. And let's also keep in context, when the company made statements to its investors, what were they talking about? They were talking about what they saw in the Phase III trials. They didn't see anything like that in the Phase III trials. And more importantly, they didn't even see one, not one, serious adverse event related to liver toxicity in all of the CAPB trials. And we know that because the FDA tells us that. So what are you saying, that Mr. Hahn may have been reckless or negligent in not distinguishing that one case from the Phase III trials? I mean, clearly you've got a problem with his statement, and I think your best argument is look at the context of everything. But I'm having trouble with the point you're making now. I don't quite understand it. Okay. So I'll go back to Mr. Hahn's statement, which is kind of where I started. And if you could talk directly into the microphone. Oh, I'm so sorry. Yeah. I'll go back to that statement. And, again, context. I agree with you. Context is important for all of this. And he was asked the specific question from an analyst on a live conference call. He was asked, can you talk to me about the sordid past of Keteq and compare that to the solithromycin clinical trials? The sordid past of Keteq was what plaintiffs pled, and that is serious liver toxicity that resulted in death, liver transplants, and liver failures. Right. But they're not limited to those things. I agree it's not limited. I agree. But it was those kinds of cases that led to congressional inquiries. That's a pretty sordid past. It's those kinds of cases that led the FDA to realize that certain data from the Keteq clinical trials was fraudulent, and they had to take back from that. That's not what we're talking about here. And so if we look at it in that context in Mr. Hahn's statement, you asked me if, am I going to say is it reckless? Certainly not. Is it negligent? I would say yes. You agree it wasn't precise enough, right, to be fully forthcoming? Well, obviously everyone would like all the information that they could possibly get, but I think I would take a little bit of issue that he wasn't forthcoming. Should he have disclosed the hepatitis example, that one case out of more than 2,000 people that participated in all the various trials, perhaps that would have been ideal. But that's not the standard. But most importantly, Your Honor, I would say, and it's certainly not indicative of an intent to defraud SEMPRA investors. So again, it seems to me that when you look at the thing as a whole, that there is room to understand why there may have been some confusion over two points. One is, what kind of liver damage are we talking about? I mean, there are all kinds of liver damage. What kind are we talking about? And which trial are we talking about? And I do think it's an important point in your favor that in the CABP trials there were no cases of liver toxicity. I understand that to be undisputed as far as the CABP trial. I think the plaintiffs are calling elevated ALT liver toxicity, so I'm guessing my friend would dispute that. But what I'm saying is that he talked about serious adverse event reporting, which is true. If there's a serious adverse event, it has to be reported. The FDA told us in the briefing book for the CABP trials there wasn't one serious adverse event. I guess what I'm saying is I can see that there's room for confusion over what kind of liver damage we're talking about, over whether we're making a comparison to whatever the key tech or not, and as to which trials we're talking about, and as to how the question was posed. The combination of circumstances and the fact that the different nomenclatures, what is meant by, what did you mean, what is meant by liver toxicity, or which trials were you talking about, it's, I can see that there's enough of a gray area there, that it might not be enough to just say that there was a, is there an inference of C-enter? I don't know, is there a strong inference of C-enter? Is the alternative explanation implausible? So I have to thank what Congress was trying to do. And as I say, this is a, obviously you don't want investigators to be defrauded, but we're talking about, in community-based pneumonia, we're talking about something that is really a very serious public health threat. And as I say, the development of new antibiotics, we're running only one short step ahead of bacterial resistance. And I worry if in addition to all the trials and all the process it takes to get FDA approval, it can take years, it can take very expensive trials, it's a long, expensive process in every way, and that's a deterrent to developing needed drugs. And if you pile on top of that a securities fraud suit and the expense involved in that, I think we may be developing, we may be deterring the development of very, very beneficial treatments. If we draw it to size, because every time there's an FDA approval, investors are going to say, oh, we thought the FDA was going to approve this. And of course you don't go, you don't seek FDA approval thinking that the FDA is not going to approve it. But all I'm saying is I do think Congress was concerned as a bottom line with not putting too many impediments in the development of medical treatments that could bring a lot of good to a lot of people. That's what I think Congress had in mind, this kind of suit. This is on the edge. I agree with your comments, Judge Wilkinson, and I would say I'm not endorsing, of course, a position that nevertheless a pharmaceutical company could go out and lie to its investors, of course. But the case law recognizes that. I'm not asking you to abandon your position, because your position is that there's no sinner at all, and you can't even draw a weak inference of a sinner. But I don't know that I go with you on that. I think your most persuasive point is the statute. I agree that's my most persuasive point, in addition to the case law that says that we have to look at these statements in context. And if we look at that context, drug discovery is inherently risky, as you've noted. There are going to be some positive things and negative things. If the company was – I see my red lights on, but if I can finish the thought. Yeah, go ahead. If the company, like in Zach or these other cases that my friend cited, that the company had discussions with the FDA about one thing, but told investors something different, that's a different case. But that's just not what we have here. At most, we have a disagreement about interpretation of the clinical trial data that was fully disclosed to investors. Thank you, Your Honor. All right. Mr. Hubachek, you've got some rebuttal time. Thank you, Your Honor. I'd like to begin where my friend just left off. This is not a question of interpretation of data. Everyone agrees. Dr. Avigan of the FDA, Dr. Oldak, one of the defendants, everyone agrees that this is not merely liver toxicity that this patient suffered. It's actual drug-induced liver injury. They had to take the person off of the drug. So it's not a question of interpretation at all. And if there's one point I'd like to make really clear is that there are plenty of cases saying that it's okay for companies to express confidence. I accept that and I understand that. But when the rubber hits the road, to use Judge Wilkinson's terminology, is when you get into misrepresenting what the data is. And that's what our claim is. And it's not just a... When did this misrepresentation, the alleged misrepresentation occur? Was it in response to a telephone question? Or how did it come up? It was an analyst question. I'm glad Your Honor asked that question because my friend described it as impromptu. The last thing that a question about Ketek would be for this company would be impromptu. As Defendant Fernandez said, 10 years earlier when they started the company, they knew that they had to distinguish Ketek. I counted and I cited them in the brief four separate times where analysts asked Ketek-related questions. There's no question that Ketek hung over this... a good number of instances of liver damage. Is Ketek even on the market now? I believe that it's on the market with a very limited label. But didn't Ketek have a pattern of liver damage? And would a comparison, a fair comparison be, unlike Ketek, this doesn't have the problems that arose with Ketek? And that would be an accurate description of the trial. Actually, Your Honor, Slytheromycin had a stronger signal of liver injury than did the Ketek trial. It was only when Ketek went into the market and had much more expansive use that these other liver injuries appeared. But if you look just at the trial records, Slytheromycin is worse. So clearly they would be concerned and the FDA would have to be concerned in terms of approval and investors would have to be concerned about the ability to distinguish Ketek because that was ultimately going to be the deciding factor. And what happened here is that not only with Defendant Hahn's statements, but also when Defendant Fernandez and Defendant Oldak were talking about why they changed the NASH protocol, they alighted the information about the patient that suffered hepatitis from their reasons for changing the NASH protocol, and the district court found that to be misleading to investors. So there is a pattern here, which is similar to what happened, I believe, in Zach, where there were misstatements and then there was also withholding of the FDA's actual recommendation. Here we have two instances of the same fact not being disclosed. And my friend also conceded that all these defendants are intimately familiar with the record here of the results of their own trials. So when Defendant Hahn says 2,000 exposures, there's absolutely no question that he's talking about everyone who received that drug, including a person who suffered liver injury, and liver injury cannot be defined as being excluded by liver toxicity as a term. So there's no question that they're misleading here on the most important facts that have to do with the potential approval of this drug. And I'm not saying that you should somehow hold against them that they want to earn money. What I'm saying is, as was the case in the Asparian case from the Sixth Circuit, where a company has basically lost a couple hundred million dollars and they're looking at a potential revenue stream of $2 billion, this court can draw the inference that these executives would be extremely familiar with their own test results. But I thought there was case law out there that said that the desire to raise capital doesn't feed into the see, enter thing. I understand that there is that case law. My point is a different one, which is that when you have lost $200 million and you have the potential But what you can't do is say that the desire to raise capital, which is present in every developmental drug case, and obviously when people are raising capital, by and large, they give an optimistic view of the company's prospects. And the Supreme Court and other courts have said you can't hold a desire to raise capital against a person. Or the fact that a statement was made by someone in a core position. I understand that, Your Honor. And my last point would be that this case is virtually identical to Schoenemann. In Schoenemann, they misrepresented what the actual data was because they had a theory as to why that didn't matter. That's exactly what we just heard from my friend. They misstated or misrepresented the data in two separate instances. Thank you, sir. We appreciate it. We will come down and greet counsel and move directly into a final case.
judges: J. Harvie Wilkinson III, Barbara Milano Keenan, Albert Diaz